GRANITE PEAK LAW PLLC
Gregory G. Costanza, Esq.
Adam H. Owens, Esq.
P.O. Box 635
Bozeman, MT 59771
T: 406.530.9119
F: 406.794.0750
adam@granitepeaklaw.com
gregory@granitepeaklaw.com

Attorneys for Defendant Medport, LLC


## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

JIMMIE G. BILES, JR., MD,                          Cause No. 19-CV-48-F

Plaintiff

v.

JOHN H. SCHNEIDER and MEDPORT, LLC,    **DEFENDANTS RESPONSE TO**
                                                                                  **PLAINTIFF'S MOTION FOR PARTIAL**
                                                                                  **SUMMARY JUDGMENT**

Defendants


Defendants John H. Schneider and MEDPORT, LLC hereby file their response to Plaintiff's Motion for Partial Summary Judgment on Plaintiff's claim that Defendants breached the confidentiality clause of the Settlement Agreement by posting notes from third-party interviews about Biles past conduct, and for Plaintiff's request for an award of liquidated damages and a permanent injunction against Schneider from publicizing confidential information. For the reasons set forth herein, this Court should deny Plaintiff's Motion.

### A.    LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to the material facts and the moving party demonstrates it is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56; *see also Wayt v. Miller*, 2002 WL 32443035, D. Wyoming (2002). The relevant inquiry regarding a motion for summary disposition is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 US 242, 251-52 (1986).

Rule 56(c) requires the moving party to cite to particular parts of materials in the record to show that the cited materials do not establish a genuine dispute. According to the Supreme Court, "...the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 US 317, 322 (1986).

## B.   DISCUSSION

### 1.  THE PHRASES AT ISSUE IN THIS MATTER WERE IN THE PUBLIC RECORD AND NOT SUBJECT TO THE CONFIDENTIALITY PROVISION OF THE SETTLEMENT AGREEMENT

The confidentiality provision of the Settlement Agreement at issue herein states in relevant part:

> The parties agree to keep the details and amount of the settlement confidential, including keeping **all matters not currently in the public record (defined as the Court files and documents or newspapers)** confidential, and they will not reveal confidential matters to any persons or entities unless required to do so according to law. It is specifically stated that this provision will not prevent any party from testifying in any proceeding if required to do so according to law. Nothing in this Settlement Agreement prevents any party from testifying truthfully as required or instructs him to testify in a particular manner. Moreover, the parties may disclose the terms of this Settlement Agreement to their own professionals (i.e., lawyers, accountants, tax specialists) employed as necessary for professional advice. *Plaintiff's Exhibit A, Settlement Agr., p.4.*

Plaintiff alleges that the Bonner Stinson interviews were confidential and that the publication on healthcare-malpractice.com of select excerpts from these interviews was in violation of the confidentiality provision. *Plaintiff's Mtn for Partial Summary Judgment* [Doc. 74], p. 11.

Plaintiff's argument is misplaced because these same excerpts, largely about alcohol abuse and bullying, were often stated, quoted and used in the underlying litigation[1] prior to the execution of the Settlement Agreement, and were therefore in the public record, contrary to Plaintiff's assertion that "the Bonner Stinson Interviews were not published in the public record ("Court files and documents or newspapers") during the defamation case." *Plaintiff's Mtn for Partial Summary Judgment* [Doc. 74]*, p. 11.* Moreover, Plaintiff's allegation that Dr. Schneider "published the Bonner Stinson interviews" is false; only brief, select excerpts from these lengthy 64 pages of interviews were published on healthcare-malpractice.com and therefore it is misleading to imply that these interviews were published *in toto.*

In one of his affirmative defenses in the underlying litigation (part of the "Court files" that were in the public record and not confidential), Schneider stated:

> Plaintiff's action is barred by truth because the allegations regarding Plaintiff contained in the flier are largely true in that Plaintiff has been sued several times, Plaintiff was drinking alcohol and driving, Plaintiff plead guilty to driving under the influence (the exact BAC unknown because Plaintiff refused to undergo the BAC examination and, therefore, voluntarily lost his driver's license instead), upon information and belief Plaintiff has engaged in unlawful possession of controlled substances, and Plaintiff has had poor surgical outcomes.
> *Doc. 13, Case No. 2:11-cv-00366-NDF; Answer and Counterclaim; ¶39.*

It is clear from this affirmative defense in ¶39 of the *Answer and Counterclaim* that allegations of Biles' drinking were part of the "public record" in the underlying case and therefore these allegations do not constitute "confidential matters" under the Settlement Agreement. *See also, Id.* at ¶43a ("Plaintiff [Biles] has voluntarily injected himself into the controversy by drinking alcohol and driving…" which is "a course of conduct that is illegal and is bound to invite attention and comment" because Wyoming "uses a public booking system that displays photographs and charges of people arrested.")

---

[1] *Biles v. Schneider,* No. 2:11-cv-00366-NDF (D. Wyo. Dismissed June 18, 2012)

Schneider elaborates in another affirmative defense in the underlying litigation that Biles, through his conduct, has made the public aware of certain behaviors that were later described on healthcare-malpractice.com, to wit:

> Plaintiff is himself responsible for negative public perceptions regarding him and his personality because Plaintiff is known to and/or has: often consumed alcohol while driving; consumed alcohol while driving with employees while engaged in the course and scope of business; allows or has allowed his wife – a non-medically trained individual – to provide point of contact care for his patients (and may bill Medicare, Medicaid and/or insurance companies for these services); engaged in medical decision-making while under the influence of alcohol; bad-mouths other physicians and medical personnel; engages in subversive conduct toward other physicians; creates conflict with his employees and the employees of other physicians; waived a gun around his office and pointed that gun at an employee and commanded that the employee "dance"; fails to pay people who provide goods and services at the ranch owned by Plaintiff (or a company he controls); has failed to uphold or fulfill contractual obligations and commitments to parties connected to ranch activities and/or business ventures and other acts which create and foster the bad reputation he created for himself.
> Doc. 13, Case No. 2:11-cv-00366-NDF; Answer and Counterclaim; ¶43b.

This affirmative defense (¶43b) in the underlying litigation contained information that became part of the "public record" (i.e., those "[c]ourt files and documents or newspapers") that were not protected by the confidentiality provision of the Settlement Agreement. The information in this affirmative defense is the same information that was published on healthcare-malpractice.com, for example where "Barb from Xray" states that, "Dr. Biles had a rifle in his hand aimed at me and said 'dance, Barb, dance'." *See Plaintiff's Exhibit G, p. 3.* Compare this statement on the webpage with the core allegation in ¶43b of Schneider's original affirmative defense above (Biles "waived a gun around his office and pointed that gun at an employee and commanded that the employee "dance"). These allegations are clearly the same, as there was only one gun incident at work involving Biles and Barb Kessler, and numerous people[2] were knowledgeable about or

---

[2] Including Dr. Emery, Jeff Lapp, Dr. Schmidt, Sandie Jones, Scott Wilson, Jesserae Graham Baker, Barbara Carlson, attorney DiLorenzo, and many others. See pp. 9-13 of Plaintiff's Exh. C.

involved in this incident. *See Plaintiff's Exhibit C, pp. 9-13,* including *Letter from Cody attorney Robert J. DiLorenzo to Barbara Carlson of Big Horn Orthopedic Clinic about the gun incident involving Biles from September 5, 2006.*

There is also a quote from Debbie Nilsen, taken from the Bonner Stinson interviews and part of Schneider's previous affirmative defense, where Ms. Nilsen describes going to Biles' ranch and observing him drink and drive. *See Plaintiff's Exhibit C, Doc. 58-12, pp. 33-34.* This is the same exact allegation made in the affirmative defense ¶43b above (Biles "consumed alcohol while driving with employees while engaged in the course and scope of business."). This type of information, part of the "court files and documents," is clearly outside the scope of the confidentiality clause and raises a genuine issue of material fact as to whether this information was already part of the public record at the time the Settlement Agreement was entered.

The same is true for the statement from Biles' previous physician assistant Mr. Harley Morrell. On healthcare-malpractice.com, Morrell is quoted as "PA Harley," who states that he saw Biles "drink at work" and "smelled alcohol on his breath during the workday." *See Plaintiff's Exhibit G, p. 4.* This is the same allegation made in affirmative defense ¶43b above from the underlying litigation (Biles "engaged in medical decision-making while under the influence of alcohol."). Even in his interview, Mr. Morrell states that he made a complaint to the Wyoming Board of Medicine about Biles' drinking after he left the employment of Dr. Biles (*See Plaintiff's Exhibit C, p. 32*), which supports the fact that this information was not only part of the "court files and documents" in *Biles v. Schneider*, but it was also part of the record of alcohol-related employment information that was reported to the Wyoming Board of Medicine (by Morrell) and to the CEO of West Park Hospital in Cody (by Schneider), after a nurse reported that Biles' came to the operating room impaired (*See Plaintiff's Exhibit C, p. 60*).

Further proof that the information posted on healthcare-malpractice.com was publicly available before the Settlement Agreement was entered comes from Plaintiff Biles's brief in Opposition to Defendants' Motion to Release Deposition of Lisa Shaurette Fallon in the underlying civil litigation (case no. 11-CV-366F, Doc. 18). *See* Defendants' Exhibit A, Doc. 18, filed 02/24/12. In the exhibits attached to that brief, which are also part of the underlying "court files and documents" exempt from confidentiality, numerous allegations are made against Biles that also appear in substantially similar form on healthcare-malpractice.com.

For example, in Document 18-1 from the underlying litigation titled "Answers to Interrogatories," it is stated (either by Fallon and/or Schneider) that "Jones referred to Biles as a 'bear and asshole' and he demanded his employees go into 'damage control' after Biles got arrested. *Defendants' Exhibit C, Doc. 18-1, p. 1; see also Defendants' Exhibit D.* The document goes on to state that, "Jones also confirmed to Schwindt that Dr. Biles former and current employees complained that he frequently drove and drank, coming from clinics and the hospital, picking up his favorite drink, Crown Royal from several of the liquor stores around town." *Id.* This document is replete with specific names (including Morrell, Stacia Jensen, and other physicians) who describe Biles drinking behavior ("he would routinely pick up a fifth of whiskey and drink and drive home from clinics..."); his abusive behavior ("[t]he other story from that office was that Dr. Biles had pulled a rifle out and aimed it at radiology worker in their office and no one wanted to work in that building near Dr. Biles."); and the reason behind the flyer ("... to warn people of a monster and a bully whose alcohol abuse is legendary and who believes he is above the law. He has hurt many professionals and threatens the lives of every person who lives in that community when he drives or shows up to the operating room drunk.)." *Id.* at p. 4; *see also Defendants' Exhibit D, Doc. 18-2, Defendant's Answers to Plaintiff's Interrogatories*, which contains the same information.

Similar commentary appears on healthcare-malpractice.com, where Ms. Nilsen describes the "Crown Royal and Coke" drunk by Biles, and where Jesse the X-ray Tech describes how Biles "holds a lot of power over his employees." *Plaintiff's Exhibit G, p.3*. These descriptions on the webpage are substantially similar to the allegations above that Biles drank "Crown Royal" and "demanded that his employees go into damage control." In essence, Biles held such power over his employees that he was able to demand that they burnish his personal image outside the scope of his medical practice after his arrest. Even the comment from Fallon that Biles is a "monster and a bully" constitutes the same description from Jesse the X-ray Tech that Biles is "cruel and vindictive and they are all (anyone who has worked for him) completely afraid of him." All of these allegations and comments on healthcare-malpractice.com were describing the same set of incidents involving Biles that were already in the public record from the underlying litigation. As such, these comments on healthcare-malpractice.com were not confidential and no breach of the Settlement Agreement's confidentiality clause occurred when these comments were posted to healthcare-malpractice.com.

2.  **PLAINTIFF'S REFERENCE TO THE RULES OF CIVIL PROCEDURE TO INTERPRET THE SETTLEMENT AGREEMENT GOES BEYOND THE MEANING ESTABLISHED IN THE AGREEMENT**

Plaintiff's argument that the interviews are "trial preparation materials" under Fed. R. Civ. P. 26(a)(3) [sic] and Wyo. R. Civ. P. 26(b)(3), and therefore constitute "confidential materials" under these rules is both a strained interpretation of the rules of civil procedure and goes beyond the definition established in the Settlement Agreement for what constitutes confidential information and non-confidential information. This court should decline to interpret the confidentiality provision of the Settlement Agreement in the context of the rules of civil procedure because the use of the phrase "public record" in the Agreement is sufficiently defined to encompass the published comments about Biles as non-confidential.

Reading the confidentiality provision in the context of the civil rules of procedure asks the court to rely on language outside of the agreement to interpret the agreement's meaning, which is inappropriate when the meaning of "public record" is unambiguous in the Settlement Agreement. As the Wyoming Supreme Court articulated in *Amoco Production Co. v. EM Nominee Partnership Co.*, 2 P. 3d 534, 540 (Wyo.2000):

> According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co., v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo.1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co.*, 882 P.2d at 220; *Prudential Preferred Properties*, 859 P.2d at 1271. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 539 (Wyo.1996); Prudential Preferred Properties, 859 P.2d at 1271.

The court should not re-write the definition of "public record" under the guise of interpretation, and so long as there is no ambiguity, the court is "bound to apply contracts as they have been scrivened." *Id.* at 540 (citing *McMurry Oil Co. v. Deucalion Research, Inc.*, 842 P.2d 584, 588 (Wyo.1992); Kidd v. Kidd, 832 P.2d 566, 570 (Wyo.1992) (internal citations omitted). Under the rules of contract interpretation, the phrase "court files and documents" is sufficiently broad to encompass the Bonner Stinson interviews, which clearly constitute "documents" that were related to the underlying litigation.

Even Plaintiff's assertion that the interviews are confidential under the rules of civil procedure is a wrong interpretation because these rules allow discovery of the Bonner Stinson interviews. These rules of civil procedure pertain to the discoverability of trial preparation materials ("documents and tangible things") prepared in anticipation of litigation or trial, subject to the substantial need/undue burden test with respect to fact work product. *See Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F. 3d 695, 704, FN 12 (10th Cir. 1998) ("Rule 26(b)(3) prevents

discovery of an attorney's work product unless (1) the discovering party can demonstrate substantial need for the material and (2) the discovering party is unable to obtain the substantial equivalent of the material by other means without undue hardship.")

In discussing the discoverability of an attorney's work product, the U.S. Supreme Court stated in *Hickman v. Taylor*, 329 U.S. 495, 512 (1947):

> We do not mean to say that all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases. Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had. Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. Or they might be useful for purposes of impeachment or corroboration. And production might be justified where the witnesses are no longer available or can be reached only with difficulty. Were production of written statements and documents to be precluded under such circumstances, the liberal ideals of the deposition-discovery portions of the Federal Rules of Civil Procedure would be stripped of much of their meaning. But the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order.

Here, Plaintiff's interpretation of the Bonner Stinson Interviews as categorically "confidential" under the rules of civil procedure is inaccurate because the contents of these interviews are wholly factual and devoid of *any* attorney mental impressions from Bonner or Stinson because their paralegal at the time, Sarah Thomas, conducted the interviews. Even Ms. Thomas adds virtually no editorializing or mental impressions to the interviews.

A review of the interviews by Ms. Thomas shows that she is largely quoting or paraphrasing third-party witnesses who describe Biles' past behavior, witnesses who also described Biles as a "drunk" or a "bully," phrases central to Plaintiff's earlier allegations of defamation and his new claims for breach of the confidentiality provision of the Settlement Agreement. As such, these

interviews were discoverable under Rule 26(b)(3) and would likely have been produced by Bonner Stinson because the interviews were relevant to their affirmative defenses and counterclaims in the defamation suit. *See, e.g., Defendants' Exhibit B, Counterclaim ¶¶22-24, ECF Doc. 13, p. 12* ("Then, John Schneider as chief of surgery for West Park Hospital received complaints of Biles taking care of patients while under the influence of alcohol. John Schneider addressed this matter with Biles in direct conversation. Biles denied taking care of patients while under the influence of alcohol. This further angered Biles and his animosity toward John Schneider was apparent.").

Furthermore, Plaintiff's reference to Rule 26(b)(3) should be discarded because the "public record" exception of the confidentiality provision specifically encompasses information ("matters") related to "Court files and documents or newspapers." Not only were excerpts from the Bonner Stinson interviews part of the "court files," but the entire Bonner Stinson interview notes also constitute "Court documents" that Plaintiff describes as "work product" from Bonner Stinson. The fact that the confidentiality provision exempts both "court files" and "court documents" is significant. Court files are generally defined as those documents "filed" with the court. However, the phrase "court documents" means anything that was generated as a "document" related to the underlying litigation, separate from court files, which would clearly encompass written witness interview statements that are devoid of attorney "work product."

For these reasons, the court should deny Plaintiff's motion for partial summary judgment because it is not an "undisputed fact" that the Bonner Stinson interviews were intended to be confidential by the parties when the core allegations contained in these interviews regarding Biles' drinking and workplace behavior are virtually identical to the information posted on healthcare-malpractice.com.

3. **DEFENDANTS DID NOT BREACH THE CONFIDENTIALITY PROVISION BECAUSE THE TERMS "ALL MATTERS" AND "CONFIDENTIAL MATTERS" ARE AMBIGUOUS WHEN APPLIED TO THE PHRASE "BILES ESCAPES JUSTICE"**

While the phrase "public record" is sufficiently defined to encompass the Bonner Stinson interviews because the same excerpts of these interviews were part of the court files, and the interviews themselves constitute court documents, the same cannot be said of the phrase "all matters" and "confidential matters." The Settlement Agreement is vague, indefinite and ambiguous in its use of the phrase "all matters" and "confidential matters" with respect to the scope of what is confidential, even when this phrase is limited by the term "public record." The phrase "[a]ll matters" in the confidentiality provision is so broad as to be indefinite because it threatens to silence all speech by Schneider that even mentions Biles' name if such words or phrases weren't uttered or used in the underlying litigation's "files and documents."

The phrase "Biles Escapes Justice" is a perfect example of why Plaintiff's interpretation of the confidentiality clause is ambiguous and overbroad. Plaintiff argues that the use of this phrase on a webpage about Biles on healthcare-malpractice.com violates the confidentiality provision of the Settlement Agreement because the phase did not exist "in the public record prior the [sic] execution of the settlement agreement." *Plaintiff's Mtn for Partial Summary Judgment* [Doc. 74]*, p. 11.* Essentially, Plaintiff interprets the confidentiality provision so broadly as to encompass any phrase about Biles that was not actually used in the underlying litigation, bringing the phrase "Biles Escapes Justice" within the "all matters" scope of the confidentiality provision because this phrase wasn't previously part of any identifiable "court file" or "court document."

The problem with this interpretation is that the phrase "Biles Escapes Justice" was not even a "matter" contemplated at the time the Settlement Agreement was entered. It cannot be said as a matter of law that this phrase was within the contemplated scope of those "matters" that were supposed to be kept confidential. Merriam-Website defines the word "matters" as "the events or

circumstances of a particular situation[3]." Under this common definition, matters are related to specific events or circumstances. However, the phrase "Biles Escapes Justice" does not actually refer to any specific event or circumstance because it is simply the title of the page about a topic of public concern, namely conduct that implicates a physicians' ability to practice medicine. Moreover, to the extent this phrase touches on "matters" that were connected to the underlying litigation, the phrase is likely referring to Biles bullying and alcoholism that were clearly part of the "public record" of court "files and documents" when the Settlement Agreement was entered.

4. **The Absolute Litigation Privilege Grants Immunity to Schneider to Use the Posted Information for Litigation Purposes**

The Wyoming Supreme Court has recognized the absolute litigation privilege in the context of publishing defamatory information in a judicial proceeding. *See Abromats v. Wood,* 213 P. 3d 966, ¶9 (Wyo. 2009). Under the privilege, "a witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding." *Id.,* quoting Restatement (Second) of Torts § 588 (1977). The Wyoming Supreme Court has further found that "witness immunity" extends "to the preparation of affidavits of potential witnesses in *Elmore v. Van Horn,* 844 P.2d 1078 (Wyo.1992).

Moreover, courts in a number of jurisdictions have concluded that the absolute litigation privilege is applicable to breach of contract actions, at least where immunity from liability is consistent with the purpose of the privilege. *See Kelly v. Golden*, 352 F.3d 344, 350 (8th Cir.2004) (holding that Missouri's absolute privilege precluded liability for an alleged breach of a nondisparagement/confidentiality agreement based on statements made in a judicial proceeding); *Ellis v. Kaye-Kibbey*, 581 F.Supp.2d 861, 880-81 (W.D.Mich.2008) (predicting that the

---

[3] https://www.merriam-webster.com/dictionary/matters accessed May 18, 2020.

Michigan Supreme Court would hold that the absolute litigation privilege "preclude[s] breach-of-contract liability [for] one who gives testimony or produces information in a judicial proceeding — at least to the extent that such action was necessary to comply with a subpoena or other order (and perhaps even if the communication was made in court in a judicial proceeding but not required by any subpoena or court order)"); *Wentland v. Wass*, 126 Cal.App.4th 1484, 1492, 25 Cal.Rptr.3d 109 (2005) ("whether the litigation privilege applies to an action for breach of contract turns on whether its application furthers the policies underlying the privilege"); *Tulloch v. JPMorgan Chase & Co.*, 2006 WL 197009, at *5 (S.D.Tex. Jan.24, 2006) (concluding that Texas law of absolute privilege bars all claims — regardless of the legal theories on which they are based — seeking "defamation damages," meaning damages for injuries "flowing from the communication of allegedly false statements during a judicial proceeding").

Plaintiff argues that Schneider posted copies of the Bonner Stinson witness interview notes, including in the case *United States v. Schneider*, 1:17-CR-00077-SPW (D. Mont. filed June 22, 2017) (the "bankruptcy criminal case"), "for no good reason." *Plaintiff's Mtn for Partial Summary Judgment* [Doc. 74], p. 11. First "good reason" is not the applicable legal standard to the absolute litigation privilege in Wyoming; instead the standard is simply whether the published information has some relation to the proceeding. In his bankruptcy criminal case, Schneider sought to stay his sentence from Judge Watters, arguing that his counsel failed to present evidence to the court that "could have demonstrated that Defendant Schneider did not engage in any criminal activity in the *Biles v. Schneider* lawsuit." Schneider then introduced document 58-12 as Exhibit L (the Bonner Stinson interviews) as evidence to support his contention that he did not act with criminal intent in the underlying Biles matter, after Judge Watters stated in Schneider's sentencing hearing that Schneider engaged in "criminal thinking" in the Biles case.

Schneider's reply brief to the United States' Objection to Stay of Sentence sought to refute "the spurious implications arising from Plaintiff's allocution and the testimony of unsworn and unexamined witnesses presented by Plaintiff, both of which caused severe prejudice and undue bias during the sentencing hearing of Defendant Schneider on August 15, 2018." *See Defendants' Exhibit E, p. 7.* Under the absolute litigation privilege, Schneider has a right to publish the Bonner Stinson interview notes because they had "some relation" to his criminal bankruptcy case, as these interview notes are relevant to how and why Schneider became involved in the Biles litigation, they served to rebut the United States' allegations against Schneider, and Judge Watters' allegation that Schneider engaged in "criminal thinking." Under Wyoming law, this is a sufficient basis to allow Schneider to publish these notes without breaching the confidentiality provision of the Settlement Agreement.

### 5.   THE LIQUIDATED DAMAGES CLAUSE OF THE SETTLEMENT AGREEMENT IS NOT A GENUINE PRE-ESTIMATE OF LOSS

Plaintiff argues that the liquidated damages clause in the Settlement Agreement represents a "reasonable forecast of just compensation for the harm that is caused by the breach" and that the "breach is one that is incapable or very difficult of accurate estimation" under the standard set forth by the Wyoming Supreme Court in *G.C.I., Inc. v. Haught,* 7 P.3d 906, 910-11 (Wyo.2000). Without citing any evidence, Plaintiff argues that the $250,000 liquidated damages amount was a "reasonable forecast of just compensation." First, there is no evidence that the parties employed any methodology to determine whether $250,000 is a "reasonable forecast" of the harm that could be caused by a breach of the confidentiality provision. To the contrary, this amount is not connected in any way to potential damages suffered by either party as a result of a potential breach of the Agreement. Moreover, damages arising from a breach of the Settlement Agreement is readily calculable through an expert report analyzing business loss. The cases cited by Plaintiff

demonstrate that courts have upheld liquidated damages for breach of confidentiality provisions that are an order of magnitude less than the $250,000 at issue here. Accordingly, without further discovery or evidence from the parties on this issue, it is premature to rule as a matter of law that the liquidated damages provision satisfies the legal standard adopted in Wyoming.

      6.    **A PERMANENT INJUNCTION SHOULD NOT ISSUE IN THIS CASE BECAUSE ANY HARM TO PLAINTIFF IS NOT "IRREPARABLE" AND THE ABSENCE OF A DURATION TERM IN THE AGREEMENT PRECLUDES SPECIFIC PERFORMANCE BY PERMANENT INJUNCTION.**

      The Wyoming Supreme Court has noted the extraordinary character of the remedy of injunction and has stated that a court must proceed with caution and deliberation before exercising the remedy. *Rialto Theatre v. Commonwealth Theatres, Inc.*, 714 P. 2d 328, 332 (Wyo. 1986). "For a party to obtain a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Southwest Stainless, LP v. Sappington*, 582 F. 3d 1176, 1190 (10th Cir. 2009). A district court may find irreparable harm, "based upon evidence suggesting that it is impossible to precisely calculate the amount of damage plaintiff will suffer." *Id.* at 1191 (citing *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir.1990)). Stated another way, "[i]f damages can compensate a plaintiff an injunction will not lie. *Holly Sugar Corporation v. Goshen County Cooperative Beet Growers Association*, 725 F.2d 564, 570 (10th Cir.1984).

      In this case, Plaintiff seeks a permanent injunction, arguing that irreparable harm will occur if the Bonner Stinson interviews are published, including "information contained in the Bonner Stinson Interviews, or materials quoting or referencing the Bonner Stinson Interviews." *Plaintiff's Mtn for Partial Summary Judgment* [Doc. 74], p. 14. Not only does this request for injunctive relief sweep beyond the scope of the "public records" exception to the confidentiality

provision of the Settlement Agreement, it also ignores why Plaintiff's request for liquidated damages is not an adequate remedy to compensate Plaintiff, thereby bringing into question how "irreparable harm" could result unless a permanent injunction is issued. In other words, if this court finds that the liquidated damages clause is an adequate measure of damages to Biles, then Biles cannot simultaneously receive injunctive relief enjoining Schneider from publishing the interviews.

There is an additional basis to deny Plaintiff's request for injunctive relief. Specifically, the fact that the Settlement Agreement contains no specific duration term precludes the granting of a permanent injunction, because such injunction would not be based on "precise terms capable of enforcement." *See Cytogenix, Inc. v. Waldroff*, 213 S.W.3d 479 (Tex. App. 2006). In *Cytogenix*, the trial court entered a permanent injunction requiring specific performance of a licensing agreement. The Texas court of appeals reversed the trial court, stating that "[e]ven if a missing duration provision is not a material element of the contracts so as to deny enforcement entirely, it nonetheless precludes specific performance by permanent injunction." *Id.* at 488. The Texas court noted that the jury found that the contract was not one of perpetual duration, and therefore the agreement at issue did not support "perpetual injunctive enforcement." *Id.*

Here, the Settlement Agreement likewise does not contain any specific term or duration provision. Even paragraph 6 of the Agreement, pertaining to non-disparagement, contains no specific duration of enforcement. Because of this, issuing a permanent injunction would add a duration term to the Agreement that is not actually part of the Agreement. As will be argued in a future motion, the Wyoming Supreme Court has found that contracts of perpetual duration are void and unenforceable. *Police Protective Ass'n of Casper v. City of Casper*, 575 P. 2d 1146, 1149 (Wyo.1978); *see also, Jewell v. North Big Horn Hosp. Dist.*, 953 P. 2d 135, 138 (Wyo.1998); *Mariano & Assoc., PC v. Board of County Com'rs of Sublette County*, 737 P. 2d 323, 326 (Wyo.1987). If the

Settlement Agreement is susceptible to the implication of a specific period of duration, then the agreement would be terminated at will upon the giving of reasonable notice. *Police Protective Ass'n of Casper*, 575 P. 2d at 1149, citing 17A C.J.S. Contracts § 398, pp. 478-480. For these reasons, the Settlement Agreement is not one that a permanent injunction can be issued, because specific performance for a perpetual or indefinite duration is contrary to Wyoming law.

## CONCLUSION

The Wyoming Supreme Court stated that summary judgment may be appropriate "where the parties' intent is clear such that reasonable minds could not differ." *Cordero*, 67 P.3d at 621. Here, there is considerable difference in how the parties view their past and present obligations under the Settlement Agreement, including whether phrases and matters that were made public during the underlying litigation are within the scope of the Settlement Agreement's confidentiality clause. For the reasons stated above, Defendants request that the court deny Plaintiff's Motion for Partial Summary Judgment.


Respectfully submitted this 18th day of May, 2020.

/s/ Gregory Costanza
Gregory G. Costanza, Esq.
Granite Peak Law, PLLC
P.O. Box 635
Bozeman, MT 59771
Gregory@granitepeaklaw.com
(o) (406) 404-6533
(c) (307) 264-2994
Attorney for Medport, LLC and Limited Scope Attorney for Defendant Schneider


## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of May, 2020, a copy of the foregoing document was served on the following persons via CM/ECF:

Anna Reeses Olson #6-3692

Park Street Law Office
242 S. Park Street
Casper, WY 82601
T: (307) 265-3843
F: (307) 235-0243
aro@parkstreetlaw.com
Attorneys for Counter-Defendant
Jimmy Biles

R. Daniel Fleck
M. Kristeen Hand
THE SPENCE LAW FIRM, LLC
15 South Jackson
P.O. Box 548
Jackson, WY 83001
T: 307.733.7290
F: 307.733.5248
Attorneys for Plaintiff Jimmy Biles